**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **KENITHA L. FERGUSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 1:18-00404** |
| | ) | |
| **DAVIS WILSON, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court is Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 95), filed on February 5, 2019. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting her claims as they are challenged by the Defendants in moving to dismiss. (Document No. 97.) Plaintiff filed her Response and Declarations in Support on February 25, 2019. (Document Nos. 98, 101, and 101-1.) Having examined the record and considered the applicable law, the undersigned has concluded that the Defendants' above Motion should be granted.

**PROCEDURAL HISTORY**

On March 8, 2018, Plaintiff, an inmate incarcerated at FPC Alderson and acting _pro se_, filed her Application for Writ of _Habeas Corpus_ by a Person in Federal Custody under 28 U.S.C. § 2241.[1] (Civil Action 1:18-cv-00394, Document No. 1.) In her Section 2241 Petition, Plaintiff

---

[1] Because Petitioner is acting _pro se_, the documents which she has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed

complained that FPC Alderson was improperly denying her Residential Reentry Center ["RRC"] placement and refusing to provide her with adequate medical care in violation of her Eighth Amendment rights. (Id.) By Order entered the same day, the undersigned construed Plaintiff's allegations of inadequate medical treatment as an attempt to initiate a civil action pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971), and directed the Clerk to open a new civil action and include therein a copy of Petitioner's Petition (Document No. 1). (Id., Document No. 4.) The undersigned further directed Plaintiff to file a Complaint specifying, among other things, the names of individual Defendant(s) in her Bivens action and stating specific facts as to how each defendant violated her constitutional rights, and (2) either pay the Court's filing fee ($350) and administrative fee ($50) totaling $400 or file the Application to Proceed *in Forma Pauperis*. (Id.)

On March 16, 2018, Plaintiff filed her form Complaint and Application to Proceed in Forma Pauperis. (Civil Action No. 1:18-00404, Document Nos. 3 and 7.) On March 26, 2018 and April 4, 2018, Plaintiff filed Motions to Amend her Complaint. (Id., Document Nos. 8 and 9.) By Order entered on May 1, 2018, the undersigned granted Plaintiff's Motions to Amend and directed Plaintiff to file her Amended Complaint by June 4, 2018. (Document No. 10.) Plaintiff was further advised that her Amended Complaint would supersede the original Complaint (Document No. 7). (Id.)

On May 9, 2018, Plaintiff filed her Amended Complaint naming the following as Defendants: (1) David Wilson, Former Warden of FPC Alderson; (2) Jennifer Saad, Acting Warden of FPC Alderson; (3) Maria Arviza, Former Associate Warden of FPC Alderson; (4) T.

---

liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Wickline, Business Administrator of FPC Alderson; (5) Angela Dunbar, Regional Director of the FBOP; (6) Mark Inch, Director of the FBOP; (7) Matthew Mullday, Assistant Regional Director; (8) Diana Hawk-Sawyer, Administrator of the Regional FBOP; (9) Renee Harvey, Case Manager at FPC Alderson; (10) Jim Fox, Counselor at FPC Alderson; (11) Dana Renick, Health Administrator at FPC Alderson; (12) Natalie Wright, D.O. at FPC Alderson; (13) Nancy Roberts, Physician Assistant at FPC Alderson; (14) Michelle Bailey, Nurse Practitioner at FPC Alderson; (15) Morgan Cutlip, Registered Nurse at FPC Aldreson; (16) Caitlyn Stover, Registered Nurse at FPC Alderson; (17) Vicki Booher, Counselor at FPC Alderson; (18) M. Evans, Corrections Manager Coordinator at FPC Alderson; (19) S. Carver, Associate Warden of FPC Alderson. (Id., Document No. 12-2.) In her Amended Complaint, Plaintiff alleges that Defendants have violation her Eighth and First Amendment rights. (Id., Document Nos. 12, 12-1, and 12-2.) First, Plaintiff alleges that Defendants have subjected her cruel and unusual punishment in violation of her Eighth Amendment rights since her arrival at FPC Alderson on or about August 10, 2017. (Id., Document No. 12-1, p. 1.) Plaintiff alleges that Defendants Renick, Wright, Roberts, Arviza, Carver, Saad, Evans, Bailey, Stover, Cutlip, Fox, Harvey, Booher, and Wickline have acted with deliberate indifference to her depression, callouses on her feet, and the chronic pain in her neck, shoulders, hands, wrist, and back. (Id.) In support, Plaintiff first states that she met with Defendant Stover at her intake and Defendant Stover reviewed Plaintiff's medical devices, medical records, and medication list. (Id.) Plaintiff complains that Defendant Stover advised her that her medications and medical devices would not be provided until her Initial Screening. (Id.) Plaintiff states that her Initial Screening was conducted on August 17, 2017, by Defendant Bailey. (Id.) Plaintiff acknowledges that Defendant Bailey "took down my medical history" and advised Plaintiff that

her medical devices were approved. (Id.) Plaintiff, however, complains that Defendant Bailey informed her that her prior prescriptions had not been approved. (Id.) Plaintiff states that she had been taking these medications for "quite sometime." (Id.) Plaintiff alleges that she was again evaluated by Defendant Wright on August 25, 2017. (Id.) Plaintiff, however, complains that Defendant Wright did not perform a physical exam and "took away all medications that Plaintiff had been taking and then gave her a new medication that Defendant felt that Plaintiff needed." (Id.) Plaintiff alleges that she informed Defendant Wright of her "medical disabilities and what her six medical devices were for," but Defendant Wright stated there were no medical records on file for Plaintiff. (Id.) Plaintiff states that she informed Defendant Wright that the medical records had been provided to Defendant Stover. (Id.) Plaintiff acknowledges that Defendant Stover advised Defendant Wright that the records had been scanned into the system and Defendant Wright advised Plaintiff that she would review the medical records. (Id.) Plaintiff alleges that on September 2, 2017, she "hit her knee on this broken metal seat" while working in the dining hall. (Id.) Plaintiff complains that Mr. Sykes called Defendant Stover to report Plaintiff's injury, but Defendant Stover "stated she was busy" and she would call him back. (Id.) Plaintiff states that two days later, "Mr. Skyes called back again and got no answer." (Id.) Plaintiff complains that "per policy you are to been seen after an injury by a medical staff on duty." (Id.) Plaintiff further complains that Defendants Harvey, Wilson, and Evans have denied Plaintiff's request for "medical furloughs." (Id., p. 2.) Plaintiff explains that one furlough involved a follow-up surgery appointment with her orthopedic doctor." (Id.) Next, Plaintiff alleges that she informed Defendant Wright that she was suffering asthma attacks due to walking up and down the hills at Alderson. (Id.) Plaintiff complains that Defendant Wright stated that "there was nothing she can do about that" and denied Plaintiff's

request for a van pass because Plaintiff needed to walk. (Id.) Plaintiff further complains that Defendant Wright is improperly denying her a "soft shoe pass," which is causing her to have calluses on her feet. (Id.) Concerning her chronic pain, Plaintiff complains that she has been waiting for more than four months to be evaluated by a doctor. (Id., Document Nos. 12-1 and 12-2.) Finally, Plaintiff complains that she requested to see a dentist because her "gums have been bothering her and are red and swollen." (Id., Document No. 12-1, p. 2.) Plaintiff complains that she was notified that she was a 12-month waiting list. (Id.)

Second, Plaintiff alleges that Defendants Booher, Renick, Wright, Fox, Harvey, Roberts, Evans, Saad, Stover, Carver, Wilson , Bailey, Cutlip, and Wickline have retaliated against Plaintiff for filing administrative remedies in violation of her First Amendment rights. (Id., Document No. 12-1 and 12-2.) Third, Plaintiff alleges that Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Sawyer violated Plaintiff's Eighth Amendment rights by "witnessing" Defendants Renick, Wright, Roberts, Bailey, Stover, Cutlip, Fox, Harvey, Booher and Wickline's "illegal actions [and] failing to correct their misconduct." (Id.) Fourth, Plaintiff complains that Defendants Evans, Harvey, Wilson, Arviza, and Wickline have violated her Eighth Amendment rights by denying her request for a social furlough with her five children. (Id., Document No. 12-2.) Plaintiff requests declaratory, injunctive, and monetary relief. (Id., Document No. 12-2, p. 6.)

By Order entered on June 13, 2018, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees and directed the Clerk to issue process. (Document No. 14.) The Clerk issued process on the same day. (Document No. 15.) On February 5, 2019, the Defendants' filed a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment"

and Memorandum in Support. (Document Nos. 95 and 96.) Defendants argue that Plaintiff's claim should be dismissed based on the following: (1) "Plaintiff failed to exhaust administrative remedies on some of her allegations" (Document No. 96, pp. 14 – 17.); (2) "Plaintiff fails to state a viable First Amendment claim" (Id., pp. 17 – 19.); (3) "Plaintiff cannot establish an Eighth Amendment violation for deliberate indifference" (Id., pp. 19 – 24.); (4) "There is not sufficient personal involvement necessary to support Eighth Amendment Bivens liability against supervisory and non-medical Defendants (Id., pp. 25 – 26.); (5) "Plaintiff has no right to a furlough" (Id., pp. 26 – 27.); and (6) "Defendants are entitled to qualified immunity" (Id., pp. 27 – 29.).

As Exhibits, Defendants attach the following: (1) The Declaration of Natalie Wright, D.O. (Document No. 95-1, pp. 1 - 9.); (2) A copy of Plaintiff's "Public Information Data" (Id., pp. 10 – 12.); (3) A copy of Plaintiff's relevant medical records (Document Nos. 95-2.); (4) A copy of Plaintiff's "Administrative Remedy Generalized Retrieval" from August 10, 2017 through March 16, 2018 (Document No. 95-3, pp. 1 – 14.); (5) A copy of relevant pages of Administrative Remedy ID No. 915876 (Id., pp. 15 – 21.); and (6) A copy of Plaintiff's psychological records (Id., pp. 22 – 34.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on February 6, 2019, advising her of the right to file a response to Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgement." (Document No. 97.) On February 26, 2019, Plaintiff filed her Response and Declarations in Support. (Document Nos. 98, 101, and 101-1.)

## SUMMARY OF EVIDENCE

On August 10, 2017, Plaintiff arrived at FPC Alderson and an intake screening was

6

conducted by medical staff. (Document No. 95-2, pp. 84 – 90.) Registered Nurse ("RN") Stover gave Plaintiff a PPD test[2] and discussed Plaintiff's medical history. (Id.) Plaintiff reported pain in her lower back, right knee, and right ankle. (Id.) RN Stover noted that Plaintiff was currently taking medication for bronchitis, hydrocodone, and iron. (Id.) RN Stover further noted that Plaintiff had non-BOP issued braces for her wrist and back. (Id.) Plaintiff's prescription for Hydrocodone and iron were discontinued and Plaintiff as provided medication for her bronchitis. (Id.) Plaintiff's non-BOP braces were held by medical staff until Plaintiff could be evaluated by a primary care provider. (Id.)

Six days later, on August 16, 2017, Plaintiff was evaluated by Nurse Practitioner ("NP") M. Bailey. (Id., pp. 91 - 106.) Plaintiff complained of lower back and neck pain. (Id.) NP Bailey approved Plaintiff's use of the non-BOP issued braces for her wrist, ankle, and back. (Id.) Plaintiff was provided new medications for treatment of her bronchitis and it was noted that Plaintiff would be seen by a physician for additional assessment and medication regimen. (Id.) Plaintiff was approved by RN Ward for a lower bunk pass. (Id., pp. 76 - 77.) Later the same day, Plaintiff was examined by Dr. Natalie Wright. (Id., pp. 78 – 81.) Dr. Wright noted that Plaintiff's primary concern was her back, wrist, and ankle braces, and her medical restrictions on lifting. (Id.) Dr. Wright noted that she reviewed Plaintiff's "outside" medical records, but did not see any documents indicating the need for the braces. (Id.) Dr. Wright noted that a prior MRI report revealed mild narrowing of the foramen post operatively and an old neck surgery in 2015. (Id., pp. 76 – 81, 268-69.) Dr. Wright indicated that Plaintiff's "outside" medical records showed a foot surgery in 2014. (Id., pp. 76.) Dr. Wright, however, examined Plaintiff's foot, noted no discernable

---

[2] A PPD skin test is used to diagnose tuberculosis infection.

deformity, and determined Plaintiff's ability to wear a boot. (Id.) Plaintiff further acknowledged that the right ankle brace was unrelated to her foot surgery and her need for the brace was due to "weak ankles." (Id.) Dr. Wright noted that Plaintiff was not indicating any pain. (Id.) Dr. Wright document the medication for bronchitis, renewed Plaintiff's Albuterol, and hypertension medication. (Id., pp. 80 – 81.) Additionally, Dr. Wright ordered a chest x-ray, labs, and an EKG. (Id.) Plaintiff was instructed to follow-up as needed. (Id.) The following day, on August 17, 2017, Plaintiff submitted an "Inmate Request to Staff" complaining that the "blood pressure pills are causing me to retain fluid." (Id., p. 253.) On August 18, 2017, Plaintiff's chest x-ray was conducted revealing normal findings. (Id., p. 255.) On August 20, 2017, RN Stover responded to Plaintiff's "Inmate Request to Staff" stating than an appointment had been scheduled and Plaintiff should monitor "call-out." (Id., p. 253.)

On September 7, 2017, Plaintiff reported to Health Service stating that she had injured her knee when she "hit a metal pole on a table without a seat in food services." (Id., pp. 73 – 75.) Plaintiff further complained of left thumb pain. (Id.) Plaintiff was examined by NP Bailey, who noted swelling, crepitus, and full range of motion of the right knee. (Id.) Concerning Plaintiff's thumb, NP Bailey noted a decreased range of motion with equal bilateral grip. (Id.) NP Bailey noted that Plaintiff had "outside documentation of left thumb synovitis with decreased pain while using neoprene type brace." (Id.) NP Bailey provided Plaintiff with ibuprofen for pain, a finger splint, and a neoprene wrist brace for her left thumb. (Id.)

On September 8, 2017, Dr. Wright evaluated Plaintiff concerning her hypertension. (Id., pp. 71 - 72.) Plaintiff reported being on a combination hypertension medication at home that contained a "water pill." (Id.) Dr. Wright noted that Plaintiff's blood pressure was predominately normal, but she had some mild pedal swelling. (Id.) It was further noted that Plaintiff was waiting

8

on some additional orthotics to be mailed from home. (Id.) Dr. Wright prescribed new hypertension medication and instructed Plaintiff to follow-up as needed. (Id.) On September 15, 2017, Plaintiff was seen by a social worker to discuss child custody issues and issues with a fear of falling. (Id., pp. 67 – 68.) On September 12, 2017, Plaintiff submitted an "Inmate Request to Staff" requesting "medical services in reference to my medical disabilities." (Id., p. 249.) On September 14, 2017, RN Cutlip responded that an appointment had been scheduled and Plaintiff should watch "call-out." (Id.)

On September 21, 2017, Plaintiff was evaluated by Dr. Wright concerning her complaints of knee, left thumb, and wrist pain. (Id., p. 63 – 65.) First, Plaintiff continued to complain of knee pain from where she hit her knee on a pole on September 2. (Id.) Second, Plaintiff complained of left thumb pain and right wrist pain. (Id.) Plaintiff advised that she had been seeing a doctor for several years regarding carpal tunnel on her right wrist and had been wearing a splint 24 hours a day on the right hand and left thumb. (Id.) Dr. Wright noted that examination of Plaintiff's knee revealed no sign of injury. (Id.) Concerning Plaintiff's general orthopedic complaints, Dr. Wright noted that Plaintiff was accustomed to getting muscle relaxers at home and visiting a chiropractor at will. (Id.) Dr. Wright advised Plaintiff that she could get pain relievers at the commissary (Motrin) and relieve discomfort by taking a hot shower and wrapping her knees and hands in a hot towel. (Id.) Dr. Wright advised Plaintiff that she disagreed with Plaintiff wearing a brace 24 hours a day because movement of the joints was better. (Id.) Dr. Wright ordered an x-ray of the knee and made a consultation request to neurology for an EMG of the right wrist. (Id.) Dr. Wright further instructed Plaintiff to have her "outside" medical records regarding her wrist and thumb mailed to the prison for review. (Id.)

On October 11, 2017, Dr. Wright renewed Plaintiff's prescription for ibuprofen for joint

9

pain. (Id., p. 62.) On October 19, 2017, Plaintiff reported to Health Service complaining of pain in her neck that "messes with my carpal tunnel," pain in her knees when she sits down, pain in her lower back, and pain in her foot from a previous surgery. (Id., pp. 59 – 61.) Plaintiff advised that she was wearing her back brace. (Id.) Plaintiff requested that her prescription for ibuprofen be changed to another NSAID and that two plastic orthotics be allowed to be mailed from home. (Id.) NP Bailey evaluated Plaintiff noting that Plaintiff had full range of motion in her shoulder and knee. (Id.) NP Bailey advised Plaintiff that two plastic orthotics were permitted and instructed Plaintiff on how to get authorization for the orthotics to be mailed to her. (Id.) NP Bailey noted review of a prior MRI conducted at OhioHealth on July 19, 2017, which revealed Plaintiff's previous back fusion, a normal alignment of the spine, vertebral body heights maintained, bone marrow signal unremarkable, degenerative disc disease with mild disc spacing and bone spurs at C2-3, C3-4, and C6-7. (Id.) As requested, NP Bailey changed Plaintiff's ibuprofen prescription to Meloxicam. (Id.) NP Bailey further advised Plaintiff that NSAIDS may cause stomach pain, to use Tylenol for any "break through pain," and avoid triggers to pain. (Id.) NP Bailey discussed with Plaintiff that she may never be completely pain free. (Id.)

By Administrative Note entered on November 8, 2017, RN Cutlip indicated that Plaintiff had been scheduled for an EMG. (Id., p. 55.) On November 29, 2017, a Medical Trip Return encounter was performed at Health Services. (Id., pp. 50 – 51.) RN Fox indicated that Plaintiff had returned from the EMG study. (Id.) The EMG study revealed normal results with "no evidence for right cervical radioulopathy, right median mononeuropathy (carpal tunnel syndrome), or right ulnar neuropathy." (Id., pp. 184-86.) On December 17, 2017, Plaintiff reported to Health Services complaining of middle to lower back pain. (Id., pp. 47 – 49.) Plaintiff stated that her "back is locking up" and she believed the "weather had something to do with it." (Id.) Plaintiff further

10

complained that her back brace needed sewn. (Id.) Plaintiff was examined by RN Stover, who noted that Plaintiff was ambulating slowly and slightly bent forward. (Id.) RN Stover provided Plaintiff with a work idle for the day and instructed Plaintiff to continue using muscle rub, heat/cold, and Tylenol. (Id.) RN Stover directed Plaintiff to return the next morning for an examination by a mid-level provider. (Id.) The following morning, on December 18, 2017, Plaintiff was examined by NP Bailey. (Id., pp. 44 – 46.) NP Bailey noted that Plaintiff had a full range of motion in her cervical, thoracic, and lumbar spine. (Id.) NP Bailey noted that Plaintiff was "tearful and lays down on exam table until exam completed." (Id.) NP Bailey indicated that she discussed with Plaintiff that her July 2017 radiological findings were mild and her condition does not warrant narcotic pain management." (Id.) NP Bailey noted that in response Plaintiff asked "'Can I get a shot then?' and crying stops." (Id.) NP Bailey indicated that Plaintiff "easily assumes a seated position," "stands without difficulty," and her gait is within normal limits. (Id.) NP Bailey instructed Plaintiff to keep active, use over-the-counter pain medication as needed, and to stretch and use warm compresses. (Id.) NP Bailey further discussed with Plaintiff that her recent EMG was normal. (Id.)

On December 21, 2017, Plaintiff had a follow-up appointment with Dr. Wright. (Id., pp. 42 - 43.) Dr. Wright again discussed with Plaintiff that her EMG results for her neck, shoulders, and muscles in her arm were normal. (Id.) Plaintiff stated that she would occasionally get pain in her neck that shots into her hands. (Id.) Dr. Wright noted Plaintiff's old surgery at C6-C7 and discussed that the normal progression would be arthritic development over the years, some pain, and muscle spasms. (Id.) Next, Plaintiff indicated that her hands hurt from bilateral carpal tunnel and she needed surgery, but she would never have such done while at FPC Alderson. (Id.) Third, Plaintiff reported low back pain and stated that her back had "locked up" a few days prior. (Id.)

Plaintiff stated that if she was at home, she would have seen a chiropractor, received shots, and narcotics. (Id.) Dr. Wright advised Plaintiff that she believed more conservative treatment was appropriate, such as NSAIDs, moist heat, ice for selling, and that Plaintiff needed to exercise to strengthen her core muscles. (Id.) Finally, Dr. Wright noted that Plaintiff "aggressively" demanded to know what was going to be done about her asthma. (Id.) Plaintiff reported that she gets short of breath while walking up hills, then gets anxious and cries, so "something needs to be done about her walking up and down the hills." (Id.) Dr. Wright discussed with Plaintiff the difference between an asthma attack and being short of breath due to walking up the hills. (Id.) Dr. Wright advised Plaintiff to use her steroid inhaler and rescue inhaler as needed, and to work on her anxiety. (Id.) Dr. Wright noted that Plaintiff became angry and "stormed out of the office" demanding to see the Health Service Administrative or Associate Warden. (Id.)

On January 3, 2018, Plaintiff submitted an "Inmate Request to Staff" requesting a soft shoe pass and a van pass. (Id., p. 180.) RN Cultlip responded to Plaintiff's request on January 7, 2018, directing Plaintiff to address the foregoing at her upcoming chronic care appointment. (Id.) On January 16, 2018, Dr. Wright noted that Plaintiff's medications were reviewed and labs were ordered. (Id., p. 40.) On the same day, Plaintiff reported to Health Services complaining of a headache, runny nose, and body aches for two days. (Id., pp. 37 – 39.) Plaintiff was evaluated by a PA Roberts, who prescribed ibuprofen and acetaminophen. (Id.) PA Roberts further instructed Plaintiff to increase fluids and return on January 18 for a temperature check. (Id.) On January 18, 2018, Plaintiff reported to Health Services for her temperature check. (Id., p. 34.) At 12:41 p.m., LPN Dulcie noted that Plaintiff's temperature was 100.4. (Id.) It was noted that Plaintiff had on a scarf, jacket, and mask, which she was asked to remove for a repeat temperature recheck. (Id.) At 2:28 p.m., RN Stover noted that Plaintiff's temperature was 99.6. (Id.) It was noted that when

12

medical staff was discussing Plaintiff's plan of care, Plaintiff began to yell at medical staff and stated "I'm going to make calls. You can't get any care here." (Id.) On January 19, 2018, Plaintiff was again examined for her cold or flu-like symptoms. (Id., pp. 31 - 33.) Plaintiff reported coughing up phlegm, a runny nose, sore throat, facial pressure, and congestion along with a headache. (Id.) Plaintiff's temperature was 98.7 and she acknowledged taking the medications prescribed for her. (Id.) PA Roberts ordered labs and instructed Plaintiff to continue to increase fluids. (Id.)

On February 1, 2018, Plaintiff reported to Health Service for a non-work related injury. (Id., pp. 28 – 29.) Plaintiff stated that she was walking down a hill and her "knee jolted and slipped on some rocks on the hill with right foot and slipped forward." (Id.) RN Cutlip examined Plaintiff's knee noting full range of motion with some tenderness and some decrease in range of motion of left hamstring. (Id.) Plaintiff was provided an ice bag and instructed on icing the area for 20 minutes on and then 20 minutes off. (Id.) Plaintiff was further instructed to rotate the ice with warm moist heat on the hamstring and to perform range of motion exercises to prevent stiffness. (Id.) Finally, Plaintiff was instructed to take over-the-counter pain medications as needed. (Id.)

On March 6, 2018, Plaintiff submitted an "Inmate Request to Staff" requesting to "see someone" about the callouses on her feet. (Id., p. 176.) On the same day, RN Fox responded that an appointment had been scheduled and instructed Plaintiff to watch "call-out." (Id.) On March 15, 2018, Plaintiff was examined by Dr. Wright and NP Bailey based upon her request for a soft shoe pass. (Id., pp. 24 – 25.) Specifically, Plaintiff complained that she had callouses. (Id.) Dr. Wright examined Plaintiff's foot noting no visible abnormalities. (Id.) Dr. Wright and NP Bailey noted that Plaintiff did not qualify for a medical soft shoe at that time and encouraged Plaintiff to request a wider boot width to accommodate her needs. (Id.) It was noted that Plaintiff verbally

13

disagreed with Dr. Wright during the examination and stated "I can't talk to you." (Id.) Plaintiff was further encouraged to obtain outside medical record that may support her request for a soft shoe pass. (Id.)

On March 29, 2018, Plaintiff reported to Health Services complaining of neck and low back pain with loss of range of motion. (Id., pp. 20 – 23.) Plaintiff stated that ibuprofen and heat had not helped and she just woke up and could not move. (Id.) Plaintiff requested a muscle relaxer or Biaxin. (Id.) NP Bailey examined Plaintiff noting slow ambulation with forward flexion and no muscle spasms. (Id.) It was noted that during the exam, Plaintiff stated she could not rotate her head side to side. (Id.) NP Bailey contacted Plaintiff's work supervisor inquiring as to whether Plaintiff was having difficulty ambulating or doing job duties, but the supervisor indicated that Plaintiff did not appear to have any difficulties at work. (Id.) NP Bailey instructed Plaintiff to do range of motion exercises, gentle stretching, warm moist compresses, and band exercise. (Id.)

On April 12, 2018, Plaintiff was again examined by NP Bailey for complaints of chronic pain. (Id., pp. 18 – 19.) Plaintiff requested additional medication for neurological symptoms of sharp shooting pains from her neck radiating to her arms and fingers. (Id.) NP Bailey prescribed Cymbalta and acetaminophen. (Id.) NP Bailey noted that she explained to Plaintiff that Cymbalta was a mental health medication that could also be used to treat neurological pain, but she should stop taking the medication if she had any suicidal thoughts. (Id.) NP Bailey again discussed that Plaintiff may never be "pain free." (Id.) Plaintiff was further scheduled for self-directed physical therapy exercises and stretching in Health Services. (Id., p. 17.)

On April 30, 2018, Plaintiff was evaluated by NP Bailey. (Id., pp. 12 – 15.) Plaintiff reported that Cymbalta was helping with the nerve pain, but she was crying non-stop. (Id.) Plaintiff requested that Cymbalta changed to Zoloft, a muscle relaxer (Robaxin), and a new back brace.

14

(Id.) NP Bailey explained to Plaintiff that Zoloft did not have the same pain reducing properties for neurological pain, but Plaintiff indicated that she wanted the medication changed anyway. (Id.) NP Bailey changed Plaintiff's prescription for Cymbalta to Zoloft and instructed Plaintiff to follow-up with psychology as needed. (Id.) NP Bailey further explained to Plaintiff that the BOP did not replace self-purchased back braces and to follow-up with the commissary for a "waist trimmer." (Id.)

On May 31, 2018, Plaintiff reported to Health Services complaining of left leg swelling and pain from her buttocks to her ankle, neck pain, and right knee pain. (Id., pp. 8 – 10.) Plaintiff stated that she had fallen a few days before and had injured her right knee and scraped her elbows. (Id.) NP Bailey examined Plaintiff noting no visualized abrasions, swelling or edema to the elbows, pulses were equal bilaterally, and full range of motion in the left ankle, foot and toes. (Id.) NP Bailey noted that neurologically, Plaintiff was within normal limits and ambulated without difficulty. (Id.) NP Bailey noted that Plaintiff's neck and cervical spine complaints were being managed in the chronic care clinic. (Id.) NP Bailey noted some varicose veins and informed Plaintiff that such could cause some mild pain. (Id.) NP Bailey again counseled Plaintiff that she may never be completely pain free and the goal was pain management or reducing her pain. (Id.) Plaintiff was instructed to remain active, to stretch, use warm compresses, and avoid high impact activities. (Id.)

On June 3, 2018, Plaintiff reported to Health Services complaining of chest pain starting at 9:00 p.m. the previous night. (Id., pp. 2 – 7.) Plaintiff stated that she had eaten roast beef, mashed potatoes, and broccoli. (Id.) RN Stover examined Plaintiff, conducted an EKG, and contacted Dr. Wright. (Id.) It was noted that Plaintiff was not complaining of any left side pain, dizziness, or weakness. (Id.) Dr. Wright directed that Plaintiff be given Mylanta and follow-up immediately if

15

condition worsened. (Id.)

**Declarations**:

      In her sworn Declaration, Dr. Natalie Wright state she is a staff physician at FPC Alderson. (Document No. 95-1.) Dr. Wright states in detail the medical care Plaintiff received following Plaintiff's arrival at FPC Alderson (August 10, 2017). (Id., pp. 2 – 8.) Dr. Wright further states "[a]s detailed above, I, and other providers, have provided Plaintiff appropriate medical care." (Id., p. 8.)

      Inmates Patricia Means, Kathaleena Kaufman, Annie Delrio, and Gerilynn Bennett state in their sworn Declarations that "this institution has been providing Plaintiff Ferguson inadequate medical treatment and medical care." (Document No. 101, pp. 1 – 3, 6.) Inmates Means, Kaufman, Delrio, and Bennett state that "this institution has been denying medical requests as an ongoing basis" and "they are causing Plaintiff Ferguson and other inmates at this institution physical and mental injury." (Id.) Inmates Means, Kaufman, Delrio, and Bennett Means conclude that Plaintiff has been treated "deliberately indifferent." (Id.)

      Inmate Michelle Green states in her sworn Declaration that defendants provided Plaintiff with "improper medical care" by delaying numerous medical requests and requests to see a medical specialist. (Id., p. 4.) Inmate Green states that the foregoing caused Plaintiff "ongoing physical and mental injury." (Id.) Inmate Greens concludes that Plaintiff has been treated "deliberately indifferent." (Id.)

      Inmate Christian Williams states in her sworn Declaration that she has witnessed the following: (1) Defendants "treat Plaintiff Ferguson deliberately indifferent;" (2) Defendants deny Plaintiff's furlough request; (3) Defendants "not follow policy;" (4) Defendants "deny Plaintiff Ferguson's numerous requests to an RRC so she can get the medical surgeries she needs;" and (5)

Defendants "cause Plaintiff and other inmates at this institution ongoing chronic pain, physical and mental injury, cruel and unusual punishment." (Id., p. 5.)

Inmates Paris Dixon, Sarah Rogers, Taheeda George, Melody Macken, Catherine Jarrett, Chymille T. Ford, Gina Paglianite, Sherita Jones, Natasha Orbits, Alexandra Hatcher, Sarah Snyder, Selina Scott, and Carmen Johnson state in their sworn Declarations that "inmates at this institution should be directed and given choices about treatment, providers and medication." (Document No. 101-1.) Inmates Dixon, Rogers, George, Macken, Jarrett, Ford, Paglianite, Jones, Orbits, Hatcher, Snyder, Scott, and Johnson further assert that "Defendants fail to connect us inmates with quality mental health treatment" and "they have a Psychology Department that don't even do assessments." (Id.) Inmates Dixon, Rogers, George, Macken, Jarrett, Ford, Paglianite, Jones, Orbits, Hatcher, Snyder, Scott, and Johnson state that "Defendants [are] just providing us with medication and sending us on our way." (Id.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the

17

speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

### DISCUSSION

**1.    Failure to Exhaust:**

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996), requires that inmates exhaust available administrative remedies prior to filing civil actions though the administrative process may not afford them the relief they might obtain through civil proceedings.[3] <u>Woodford v. Ngo</u>, 548 U.S. 81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); <u>Porter v. Nussle</u>, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)(The Prison Litigation Reform Act's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong.); <u>Booth v. Churner</u>, 532 U.S. 731, 121 S.Ct. 1819, 1820,149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only money damages must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief, even if the process does not make specific provision for monetary relief."). Exhaustion of administrative remedies is also required when injunctive relief is requested. <u>Goist v. U.S. Bureau of Prisons</u>, 2002 WL 32079467, *4, fn.1 (D.S.C. Sep 25, 2002), <u>aff'd</u>, 54 Fed.Appx. 159 (4th Cir. 2003), <u>cert. denied</u>, 538 U.S. 1047, 123 S.Ct. 2111, 155 L.Ed.2d 1088 (2003). "[A] court may not excuse a failure to exhaust" because the PLRA's mandatory exhaustion scheme "foreclose[es] judicial discretion." <u>Ross v. Blake</u>, ___ U.S. ___, 136 S.Ct. 1850, 1856-57, 195 L.Ed.2d 117 (2016)("[A] court may not excuse a failure to exhaust, even to take [special circumstances] into account."). But the plain language of the statute requires that only "available" administrative

---

[3] 42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted.

19

remedies be exhausted. Id. at 1855("A prisoner need not exhaust remedies if they are not 'available.'") In Ross v. Blake, the Supreme Court set forth three scenarios where the administrative process is considered "unavailable": (1) The administrative process "operates as a simple dead end -- with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) The administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) The "administrator thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." Ross, 136 S.Ct. at 1859-60; also see Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)(inmate lacked available administrative remedies for exhaustion purposes where inmate was unable to file a grievance because prison officials refused to provide him with the necessary grievance forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)(allegations that prison officials failed to respond to his written requests for grievance forms were sufficient to raise an inference that inmate had exhausted his available administrative remedies.)

If an inmate exhausts administrative remedies with respect to some, but not all, of the claims he raises in a Section 1983, Bivens or FTCA action, the Court must dismiss the unexhausted claims and proceed with the exhausted ones. See Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 913, 166 L.Ed.2d 798 (2007)("The PLRA does not require dismissal of the entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. * * * If a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad.") It appears to be the majority view as well that exhausting administrative remedies after a Complaint is filed will not save a case from dismissal. See Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001)(overruled on other grounds), a Section 1983 action, citing numerous cases. The rationale is pragmatic. As the Court stated in Neal, allowing prisoner suits to proceed, so long as

20

the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. Neal, 267 F.3d at 123. In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court.. . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court. It is further clear that the PLRA does not require that an inmate allege or demonstrate that he has exhausted his administrative remedies. See Jones v. Bock, supra; Anderson v. XYZ Correctional Health Services, 407 F.3d 674, 677 (4th Cir. 2005), *abrogated on other grounds by* Custis v. Davis, 851 F.3d 358 (4th Cir. 2017). Failure to exhaust administrative remedies is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. Jones v. Bock, supra, 549 U.S. at 216, 127 S.Ct. at 921(Failure to exhaust is an affirmative defense that a defendant must generally plead and prove); also see Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a Bivens suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (Citations omitted)) The Court is not precluded, however, from considering at the outset whether an inmate has exhausted administrative remedies. "A court may sua sponte dismiss a complaint when the alleged facts in the complaint, taken as true, prove that the inmate failed to exhaust his administrative remedies." Custis v. Davis, 851 F.3d. 358, 361 (4th Cir. 2017); also see Banks v.

21

Marquez, 694 Fed. Appx. 159 (4th Cir. 2017)(finding no error in the district court's decision to sua sponte dismiss petitioner's petition where petitioner explicitly admitted in his petition that he failed to exhaust his administrative remedies).

For Bivens purposes, proper exhaustion of available administrative remedies requires that "a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require." Dale v. Lappin, 376 F.3d at 655 (internal citations omitted); also see Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006)(stating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings"). The Federal Bureau of Prisons [BOP] has established an Administrative Remedy Program, 28 C.F.R. § 542.10, *et seq.*, through which an inmate may seek formal review of issues or complaints relating to confinement. Depending upon at what level an inmate initiates it, the BOP's Administrative Remedy Program is a three-step or four-step grievance procedure. As a general matter, a federal inmate is required first to attempt to resolve her complaints informally by the submission of an "Inmate Request to Staff Member" form. 28 C.F.R. § 542.13. The inmate's request may be rejected if improper, and the inmate will then be advised of the proper administrative procedure. Id. Within 20 days after the circumstances occurred which are the subject of the inmate's complaints, the inmate must complete this first step and submit a formal "Administrative Remedy Request" on a BP-9 form to an institution staff member designated to receive such Requests, 28 C.F.R. § 542.14(a) and (c)(4), or under exceptional circumstances to the appropriate Regional Director. Id., § 542.14(d). The Warden of the institution and the Regional Director must respond to the inmate's Request within 20 and 30 days respectively. Id., § 542.18. If the inmate's Request was directed to the Warden of the

institution and the Warden's response is unfavorable, the inmate may appeal within 20 days to the Regional Director on a BP-10. Id., § 542.15(a) and (b). If the Regional Director's response is unfavorable, the inmate may appeal to General Counsel on a BP-11 form within 30 days after the Regional Director signed the response. Id., § 542.15(a). General Counsel has 40 days to respond to the inmate's appeal. Id., § 542.18. The administrative process is exhausted when General Counsel issues a ruling on the inmate's final appeal. Id., § 542.15(a). The entire process takes about 120 days to complete. An inmate's submission may be rejected at any level for failure to comply with the administrative remedy requirements or if the submission is written in an obscene or abusive manner. Id., § 542.17(a). The inmate will be provided with notice of any defect and whether the defect is correctable. Id., § 542.17(b). If a request or appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection to the next appeal level. Id., § 542.17(c).

In their Motion, Defendants argue that Plaintiff only fully exhausted her administrative remedies concerning the alleged denial of adequate medical for her neck and shoulder condition. (Document No. 96, pp. 15 – 17.) Defendants argue that all other claims asserted under the Eighth Amendment concerning inadequate medical care for Plaintiff's mental health needs, dental care, and other medical needs are unexhausted. (Id.) Defendant further argue that Plaintiff's claim of retaliation under the First Amendment is unexhausted. (Id.) In support, Defendants attach the following: (1) A copy of Plaintiff's "Administrative Remedy Generalized Retrieval from August 17, 2017 through March 16, 2018 (Document No. 95-3, pp. 1 – 14.); and (2) A copy of Plaintiff's administrative remedies concerning Remedy ID No. 915876 (Id., pp. 16 – 21). Defendants explain that "Plaintiff only fully exhausted one set of administrative remedies prior to initiation of this

lawsuit" (Remedy ID No. 915876). (Id., p. 16.) Defendants state that at the Institutional level, Plaintiff complained of neck and shoulder pain and stated that her outside doctor told her she need to see a "Physical Medicine doctor" to try to treat or condition, or surgery. (Document No. 96, p. 16 and Document No. 95-3, p. 21.) Plaintiff also requested that her job be changed, a van pass, and that she be allowed to be seen by an outside doctor. (Id.) In Response, Warden Wilson noted that Plaintiff's job was recently changed, but that there was no current indication for Plaintiff's alleged need to see an outside specialist. (Document No. 96, p. 16 and Document No. 95-3, p. 20.) Warden Wilson, however, stated that additional medical records were being sought. (Id.) Plaintiff appealed to the Regional Office requesting that she be allowed a furlough to see her own doctors. (Document No. 96, p. 16 and Document No. 95-3, p. 19.) In Response, Regional Director Angela Dunbar noted that Plaintiff's medical records were reviewed by medical staff who determined no current need for evaluation by a neurologist or a van pass. (Document No. 96, p. 16 and Document No. 95-3, p. 18.) Plaintiff then appealed to the Central Office stating that she was unsatisfied with the medical treatment for her neck and shoulder issues. (Document No. 96, p. 17 and Document No. 95-3, p. 17.) Plaintiff requested that she be allowed to be evaluated by an "outside" doctor, given a new BOP medical primary care provider, and issued a van pass. (Id.) By Response dated February 26, 2018, Administrator Ian Connors denied Plaintiff's appeal after noting that Plaintiff's recent "outside" neurological exam (November 29, 2017) revealed a normal EEG study. (Document No. 96, p. 17 and Document No. 95-3, p. 16.) Administrator Connors further noted that Plaintiff had received injections, proper medical care, and her BOP medical providers could not be arbitrarily changed due to her dissatisfaction. (Id.) Thus, Defendants argues that Plaintiff failed to fully exhaust her claims of inadequate mental health care, dental care, and medical care

concerning conditions other than her neck and shoulder. (Id.)

In Response, Plaintiff argues "unlike an FTCA claim, there are no administrative remedies to exhaust before filing a Bivens action in district court." (Document No. 98, p. 2.)

As fully explained above, Plaintiff is incorrect in her argument that "there are no administrative remedies to exhaust before filing a Bivens action." To the extent Plaintiff is asserting a Bivens claim based upon retaliation and the alleged denial of adequate mental health care, dental care, and medical care concerning conditions other than her neck and shoulder, the undersigned finds that Plaintiff failed to properly exhaust her administrative remedies pursuant to the PLRA. Plaintiff fails to produce any documents indicating that she exhausted the foregoing claims. Additionally, there is no indication or allegation by Plaintiff that the administrative remedy process was unavailable.[4] Based on the foregoing, the undersigned recommends that Plaintiff's claims regarding the foregoing be dismissed in view of her failure to exhaust the administrative remedies provided under the BOP's Administrative Remedy Program, 28 C.F.R. § 542.10, et seq., prior to filing her Complaint.

**2.    No Extension of Bivens:**

Notwithstanding Plaintiff's failure to exhaust, Defendants argue that Bivens liability has not been extended to claims of retaliation in violation of the First Amendment. (Document No. 96, pp. 17 – 19.) Defendants contend that Plaintiff's claim fails under Ziglar v. Abbasi. (Id.) Defendants note that the United States Supreme Court has only approved a Bivens cause of action in three cases – Bivens, Davis, and Carlson. (Id.) Defendants argue that Plaintiff's claim differs in

---

[4] Although Plaintiff alleged retaliation as the result of filing grievance, Plaintiff does not allege that such retaliation affected her ability to file grievances. Despite her claim of retaliation, the record reveals that Plaintiff continued to file grievances.

a meaningful way from the above cases. (Id.) Defendants concluded that since the "Supreme Court has never recognized a Bivens remedy under the First Amendment and other avenues for relief and special factors counsel against creating a damages remedy, Plaintiff's claim fails as a matter of law." (Id.) In Response, Plaintiff merely states that "Plaintiff has stated a viable First . . . Amendment claim when she brought this claim into civil court." (Document No. 98, p. 2.)

A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Bivens core premise is to deter individual officers' unconstitutional acts. Correctional Services Corp v. Malesko, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)(declining to extend Bivens to confer a right of action for damages against private entities acting under the color of federal law). In Bivens, the Supreme Court first recognized that a victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court. Bivens, 403 U.S. at 396, 91 S.Ct. 1999. In the years following the decision in Bivens, the Supreme Court recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, Carlson v. Green, 446 U.S. 14, 100, S.Ct. 1468, 64 L.Ed.2d 15 (1980). Since Carlson, the Supreme Court has consistently refused to extend Bivens liability to any new context or new category of defendants. See FDIC v. Meyer, 510 U.S. at 484-86, 114 S.Ct. 996 (declined to extend Bivens to permit suit against a federal agency); Holly v. Scott, 434 F.3d 287, 290 (4th Cir. 2006)(declining to extend Bivens to an Eighth Amendment claim against employees of a privately operated prison); Lebron v. Rumsfeld, 670 F.3d 540 (4th Cir.

26

2012)(declining to extend <u>Bivens</u> in a military context). In <u>Abbasi</u>, the Supreme Court made clear the very limited scope of <u>Bivens</u> actions and that "expanding the <u>Bivens</u> remedy is now a disfavored judicial activity." <u>Ziglar v. Abbasi</u>, ___ U.S. ___, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017). If the asserted <u>Bivens</u> claim is not one of the three <u>Bivens</u>-type actions previously recognized by the Supreme Court, closer scrutiny is required. <u>Id.</u>

In <u>Abbasi</u>, the Supreme Court set out a framework for determining whether a claim presents a "new <u>Bivens</u> context." <u>Abbasi</u>, 137 S.Ct. at 1860. As stated above, the Supreme Court has recognized a <u>Bivens</u> remedy in only three cases: (1) A Fourth Amendment claim against federal agents for violating the prohibition against unlawful searches and seizures when they handcuffed a man in his home without a warrant; (2) A Fifth Amendment general discrimination claim against a congressman for firing his female administrative assistant; and (3) An Eighth Amendment claim brought by an inmate's estate against prison officials for failure to provide adequate medical care for his asthma. <u>Id.</u> at 1854-55(citations omitted). The <u>Abbasi</u> Court explained that "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." <u>Id.</u> at 1859. Although the <u>Abbasi</u> Court did not provide "an exhaustive list of differences that are meaningful enough to make a given context a new one," the Court did provide the following "instructive" examples:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

<u>Id.</u> at 1859-60. In the instant case, Plaintiff alleges that Defendants retaliated against her for

submitting administrative remedies in violation of her First Amendment rights. The mere fact that Plaintiff alleges a violation of a constitutional right does not conclusively establish that <u>Bivens</u> extends to Plaintiff's constitutional claim. Thus, the undersigned must first determine whether Plaintiff's retaliation claim presents "a new <u>Bivens</u> context."

The Supreme Court has "never held that *Bivens* extends to First Amendment claims." <u>Reichle v. Howards</u>, 566 U.S. 658, 132 S.Ct. 2088, n. 4, 182 L.Ed.2d 985 (2012)("We have never held that <u>Bivens</u> extends to First Amendment claims."); <u>also see</u> <u>Correctional Services Corporation v. Malesko</u>, 534 U.S. 61, 67-68, 22 S.Ct. 515, 519-20, 151 L.Ed.2d 456 (2001)(noting that "we declined to create a *Bivens* remedy against individual Government officials for a First Amendment violation arising in the context of federal employment"); <u>Bush v. Lucas</u>, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)("we have not found an implied damages remedy under the Free Exercise Clause"); <u>Leibelson v. Collins</u>, 2017 WL 6614102, * 8 (S.D.W.Va. Dec. 27, 2017)(J. Berger)("[I]t is not clear that *Bivens* may be extended to First Amendment claims."). In <u>Ashcroft v. Iqbal</u>, the Supreme Court stressed that "we have declined to extend <u>Bivens</u> to a claim sounding in the First Amendment." <u>Iqbal</u>, 556 U.S. at 676, 129 S.Ct. at 1948. The <u>Iqbal</u> Court, however, noted that it assumed without deciding that respondent's First Amendment claim was actionable under <u>Bivens</u> because petitioners did not assert the above argument. <u>Id.</u>; <u>also see</u> <u>Wood v. Moss</u>, ___ U.S. ___, 134 S.Ct. 2056, 2067, 188 L.Ed.2d 1039 (2014)("[W]e have several times assumed without deciding that *Bivens* extends to First Amendment claims. We do so again in this case.") The undersigned further acknowledges that the just prior to the Supreme Court's decision in <u>Abbasi</u>, the Fourth Circuit clarified that inmates have a clearly established First Amendment right to file prison grievances free from retaliation. See <u>Martin v. Duffy</u>, 858 F.3d 239 (4th Cir. June 1,

2017)("this Court held that an inmate's 'right to file a prison grievance free from retaliation was clearly established under the First Amendment' at least as far back in time as 2010")(citing Booker v. South Carolina Department of Corrections, 855 F.3d 533, 545 (4th Cir. April 28, 2017)). Importantly, both Martin and Booker were Section 1983 actions and the issue of whether Bivens extends to the First Amendment was not addressed by the Fourth Circuit. Id. Subsequently, the Fourth Circuit issued an unpublished opinion in Patton v. Kimble reversing a district court's dismissal of an inmate's Bivens action alleging a First Amendment retaliation claim. Patton v. Kimble, 717 Fed.Appx. 271 (4th Cir. 2018). The Fourth Court determined that the district court erred in finding that the inmate failed to state a First Amendment retaliation claim in light of its decision in Booker. Id. at 271-72. The Fourth Circuit, however, did not address the issue of whether Bivens extends to the First Amendment. Id. Based upon the foregoing, the undersigned find that that Plaintiff's First Amendment retaliation claim presents a new Bivens context.

Next, the Court must determine whether Bivens should be extended to the above new context. First, the Court should consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new freestanding remedy in damages." Wilkie, 551 U.S. at 550, 127 S.Ct. 2588. "[T]he existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." Abbasi, 137 S.Ct. at 1865("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."); Malesko, 534 U.S. at 69, 122 S.Ct. at 515("So long as the plaintiff had an avenue for some redress," a court may decline to provide a new Bivens remedy). Alternative remedies can include administrative, statutory, equitable, and state law remedies. First, the undersigned finds that Plaintiff had alternative

remedies available to her through the BOP administrative remedy program. The BOP administrative remedy program allows inmates to seek formal review of issues relating to any aspect of his or her confinement.[5] Second, to the extent an inmate alleges that retaliation resulted in the filing of false incident reports, an inmate can seek review of such incident reports pursuant to 28 C.F.R. § 541.7(i). Third, any retaliation that may have resulted in an extension of an inmate's confinement (such as disciplinary action resulting in the loss of good time credit) would be actionable in *habeas corpus* pursuant to 28 U.S.C. 2241. Finally, if an inmate is being subjected to ongoing retaliation, she could seek injunctive relief. See 18 U.S.C § 3626(a)(2); also see Malesko, 534 U.S. at 74, 122 S.Ct. at 523(stating that "unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means' for preventing entities from acting unconstitutionally"); Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)(recognizing the "jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"). Thus, the undersigned finds that Plaintiff has alternative remedies available to address her allegations of retaliation. See Vega v. United States, 881 F.3d 1146, 1154 (9th Cir. 2018)(finding the inmate had alternative remedies available to address his First Amendment retaliation claim via the BOP's administrative remedy process, review of the incident report pursuant to Section 541.7, and under state law); Reid v. United States, 2018 WL 1588264, * 2 (E.D.Cal. April 2, 2018)(finding inmate had alternative remedies available through the BOP's administrative remedy program, under the Federal Tort Claims Act, a Section 2241 petition for writ of *habeas corpus*, and Bivens to the

---

[5] Plaintiff alleges that Defendants retaliated against her by moving her to the "bus stop" area of the prison.

30

extent that any alleged retaliation took the form of conduct that has already been determined by the Supreme Court to be actionable under <u>Bivens</u>); <u>Muhammad v. Gehrke</u>, 2018 WL 1334936, * 4 (S.D.Ind. March 15, 2018)(finding inmate had alternative remedies available through the BOP's administrative remedy program, *habeas corpus*, and <u>Bivens</u> to the extent that any alleged retaliation took the form of conduct that has already been determined by the Supreme Court to be actionable under <u>Bivens</u>); <u>Gonzalez v. Hasty</u>, 269 F.Supp.3d 45, 60 (E.D.N.Y. Sept. 18, 2017)(finding that inmate had two alternative remedies, the filing of administrative complaints and a petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2241); <u>Andrews v. Miner</u>, 2017 WL 7688266, * 4 (N.D.Ala. Aug. 25, 2017)(finding that the inmate had alternative remedies via the filing of a <u>Bivens</u> claim for excessive force, the BOP's administrative remedy process, and under the Federal Tort Claims Act).

Irrespective of whether an alternative remedy exists, a <u>Bivens</u> remedy should not be extended where "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" <u>Abbasi</u>, 137 S.Ct. at 1857(quoting <u>Carlson</u>, 446 U.S at 18, 100 S.Ct. 1468). Although the Supreme Court has not defined what constitutes "special factors counselling hesitation," the Court has observed that "[t]he necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." <u>Id.</u> at 1857-58. Put simply, "a factor must cause a court to hesitate before answering that question in the affirmative." <u>Id.</u> at 1858. "[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." <u>Id.</u> at 1865. The <u>Abassi</u> Court explained that since Congress did not provide for a standalone damages remedy against federal jailers when it passed

31

the Prison Litigation Reform Act ["PLRA"], "[i]t could be argued that this suggest Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." Id. The Supreme Court explained as follows:

> Some 15 years after *Carlson* was decided, Congress passed the [PLRA] of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. § 1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs.

Id. The PLRA's exhaustion requirement clearly applies to Bivens actions. Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Supreme Court has further recognized that in enacting the PLRA, Congress intended to "reduce the quantity and improve the quality of prisoner suits." Jones v. Bock, 549 U.S. 199, 203-04, 127 S.Ct. 910, 1666 L.Ed.2d 798 (2007)(citing Porter v. Nussle, 534 U.S. at 524, 122 S.Ct. at 983). Additionally, the Supreme Court has stated that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner v. Safely, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)(citation omitted). The Supreme Court explained that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id. Since prison administration is a task that has been committed to the responsibility of the legislative and executive branches of government, the Supreme Court has stated that "separation of powers concerns counsel a policy of judicial restraint." Id., 482 U.S. at 85, 107 S.Ct. at 2259. Thus, the foregoing supports a finding that Congress has been active in creating legislation regarding prisoner litigation and such causes the undersigned hesitation as to expanding Bivens to Plaintiff's First Amendment retaliation claim. See Reid, 2018 WL 1588264

at * 3(finding Congress has been active in the area of prisoners' rights, and its actions do not support the creation of a new *Bivens* claim); Gehrke, 2018 WL 1334936 at * 4(same); Gonzalez, 269 F.Supp.3d at 61(same).

Furthermore, the Abbasi Court explained that "the decision to recognize a damage remedy requires an assessment of its impact on governmental operations systemwide." Abbasi, 137 U.S. at 1858. The impact on governmental operations systemwide include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal systems are used to bring about the proper formulation and implementation of public policies." Id. The Supreme Court has emphasized that "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." Wilkie, 551 U.S. at 562, 127 S.Ct. 2588(quoting Bush, 462 U.S at 389, 103 S.Ct. 2404). In Abbasi, the Supreme Court further explained as follows:

> Claims against federal officials often create substantial costs, in the form of defense and indemnification. Congress, then, has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government. In addition, the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered.

Abbasi, 137 U.S. at 1856. The undersigned notes that expanding Bivens to allow a First Amendment retaliation claim by inmates would clearly result in an increase of suits by inmates. This increase in suits would result in increased litigation costs to the Government and impose a burden upon individual employees to defend such claims. A First Amendment retaliation claim requires an inquiry into a defendant's subjective state of mind, which often results in an issue of material fact that cannot be resolved at the dispositive motion stage. See Cochran v. Morris, 73

F.3d 1310, 1317 (4th Cir. 1996)(*en banc*)(citations omitted)(An inmate's claim of retaliation must be treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct."). The consequence of the existence of an issue of material fact is the need for a trial, which results in further litigation costs to the Government. See Gonzalez v. Bendet, 2018 WL 1524752, * 4 (S.D.S.D. March 28, 2018)(finding "that the cost, time, and energy associated with defending a *Bivens* action brought by an inmate for an action based on retaliation under the First Amendment against a federal employee are significant" and constitute a special factor counselling hesitation); Andrews, 2017 WL 7688266, * 4 – 5(same). Accordingly, the undersigned finds there are special factors counselling hesitation as to the expansion of Bivens to a First Amendment retaliation claim. See Kirtman v. Helbig, 2018 WL 3611344, * 5 (D.S.C. July 27, 2018)("Having conducted the 'special factors analysis,' the Court concludes that Plaintiff does have other avenues for relief, and there are significant economic and governmental concerns with recognizing an implied cause of action in this instance."), aff'd, 2019 WL 1513621 (4th Cir. April 8, 2019). Based upon the foregoing, the undersigned respectfully recommends that the District Court decline to expand Bivens to Plaintiff's First Amendment retaliation claim and that Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" be granted as to Plaintiff's retaliation claim.

**3.    No Deliberate Indifference:**

As a general matter, punishments prohibited under the Eighth Amendment include those that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects

inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Inmates' claims, therefore, that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987); Moore v. Winebrenner, 927 F.2d 1312, 1316 (4th Cir. 1991) cert. denied, 502 U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991)(Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk of harm to an inmate's health or safety). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v.

35

Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") Therefore, Plaintiff must first allege and eventually establish an objectively "sufficiently serious" deprivation. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that there was a substantial risk to Plaintiff's health or safety and that Defendant disregarded the serious physical consequences.

Plaintiff alleges that Defendants acted with deliberate indifference in failing to provide adequate treatment for her neck and shoulder pain.[6] For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Plaintiff alleges that her condition causes continuous severe pain and suffering. Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's injuries were serious enough to give rise to an Eighth Amendment claim.[7]

---

[6] As stated above, Plaintiff only fully exhausted her claim that Defendants provided inadequate care for her shoulder and neck pain.

[7] For purposes of their Motion, Defendants do not dispute that Plaintiff suffers from a serious medication. (Document No. 96, p. 20.)

Next, the undersigned will consider whether Defendants acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to her. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends Defendants acted with deliberate indifference in failing to provide her with appropriate treatment for her shoulder and neck condition. Plaintiff arrived at FPC Alderson on August 10, 2017, and a health screening was performed the same day. (Document No. 95-2, pp. 84 – 90.) During the health screening, it was noted that Plaintiff had non-BOP issued braces for her wrist and back. (Id.) Plaintiff's non-BOP braces were held by medical staff until Plaintiff could be evaluated by a primary care provider. (Id.) Six days later, Plaintiff was evaluated and examined NP Bailey. (Id., pp. 91 - 106.) Plaintiff complained of lower back and neck pain. (Id.) NP Bailey approved Plaintiff's use of the non-BOP issued braces for her wrist, ankle, and back. (Id.) NP Bailey noted that Plaintiff would be seen by a physician for additional assessment and medication regimen. (Id.) Later the same day, Plaintiff was examined by Dr. Wright. (Id., pp. 78 – 81.) Dr. Wright noted that Plaintiff's primary concern was her back, wrist, and ankle braces, and her medical restrictions on lifting. (Id.) Dr. Wright reviewed Plaintiff's "outside" medical records, but noted there were no documents indicating the need for the braces. (Id.) Dr. Wright noted that a prior MRI report showed mild narrowing of the foramen post operatively and an old neck surgery in 2015. (Id., pp. 76 – 81, 268-69.) On September 12, 2017, Plaintiff submitted an "Inmate Request to Staff" requesting "medical services in reference to my medical disabilities." (Id., p. 249.) On September 14, 2017, RN Cutlip responded that an appointment had been scheduled and Plaintiff should watch "call-out." (Id.) On September 21, 2017, Plaintiff was evaluated by Dr. Wright concerning her complaints of knee, left thumb, and

wrist pain. (Id., p. 63 – 65.) Plaintiff advised that she had been seeing a doctor for several years regarding carpal tunnel on her right wrist and had been wearing a splint 24 hours a day on the right hand and left thumb. (Id.) Dr. Wright noted that Plaintiff was accustomed to getting muscle relaxers at home and visiting a chiropractor at will. (Id.) Dr. Wright advised Plaintiff that she could get pain relievers at the commissary (Motrin) and take a hot shower and wrap hot towels around her knees and hands to relieve pain. (Id.) Dr. Wright advised Plaintiff that she disagreed with Plaintiff's wearing a brace 24 hours a day because movement of the joints was better. (Id.) Dr. Wright made a consultation request for neurology for an EMG of Plaintiff's right wrist. (Id.) Dr. Wright further instructed Plaintiff to have her "outside" medical records regarding her wrist and thumb mailed to the prison for review. (Id.)

On October 11, 2017, Dr. Wright renewed Plaintiff's prescription for ibuprofen for joint pain. (Id., p. 62.) On October 19, 2017, Plaintiff reported to Health Service complaining of pain in her neck that "messes with my carpal tunnel." (Id., pp. 59 – 61.) Plaintiff requested that her prescription for ibuprofen be changed to another NSAID. (Id.) NP Bailey evaluated Plaintiff noting that Plaintiff had full range of motion in her shoulder. (Id.) NP Bailey noted review of a prior MRI conducted at OhioHealth on July 19, 2017, which revealed Plaintiff's previous back fusion, a normal alignment of the spine, vertebral body heights maintained, bone marrow signal unremarkable, degenerative disc disease with mild disc spacing and bone spurs at C2-3, C3-4, and C6-7. (Id.) As requested, NP Bailey changed Plaintiff's ibuprofen prescription to Meloxicam. (Id.) NP Bailey further advised Plaintiff to use Tylenol for any "break through pain" and avoid triggers to pain. (Id.) Plaintiff's EMG was conducted on November 29, 2017, revealing normal results with "no evidence for right cervical radioulopathy, right median mononeuropathy (carpal tunnel

syndrome), or right ulnar neuropathy." (Id., pp. 184-86.) On December 17, 2017, Plaintiff reported to Health Services complaining of middle to lower back pain. (Id., pp. 47 – 49.) Plaintiff was examined by RN Stover, who provided Plaintiff with a work idle for the day and instructed Plaintiff to continue using muscle rub, heat/cold, and Tylenol. (Id.) RN Stover directed Plaintiff to return the next morning for an examination by a mid-level provider. (Id.) The following morning, on December 18, 2017, Plaintiff was examined by NP Bailey. (Id., pp. 44 – 46.) NP Bailey noted that Plaintiff had a full range of motion in her cervical, thoracic, and lumbar spine. (Id.) NP Bailey noted that Plaintiff was "tearful and lays down on exam table until exam completed." (Id.) NP Bailey indicated that she discussed with Plaintiff that her July 2017 radiological findings were mild and her condition does not warrant narcotic pain management." (Id.) NP Bailey noted that in response Plaintiff asked "'Can I get a shot then?' and crying stops." (Id.) NP Bailey further indicated that Plaintiff easily assumed a seated position, stood without difficulty, and her gait was within normal limits. (Id.) NP Bailey instructed Plaintiff to keep active, use over the counter pain medication as needed, and to stretch and use warm compresses. (Id.) NP Bailey further discussed with Plaintiff that her EMG was normal. (Id.)

On December 21, 2017, Plaintiff had a follow-up appointment with Dr. Wright and reported occasional pain in her neck that shots into her hands. (Id., pp. 42 - 43.) Dr. Wright again discussed with Plaintiff that her EMG results for her neck, shoulders, and muscles in her arm were normal. (Id.) Dr. Wright further discussed Plaintiff's old surgery at C6-C7 and that the normal progression would be arthritic development over the years, some pain, and muscle spasms. (Id.) Plaintiff stated that if she was at home, she would have seen a chiropractor, received shots, and narcotics. (Id.) Dr. Wright advised Plaintiff that she believed more conservative treatment was

appropriate, such as NSAIDs, moist heat, ice for selling, and that Plaintiff needed to exercise to strengthen her core muscles. (Id.) On March 29, 2018, Plaintiff reported to Health Services complaining of neck and low back pain with loss of range of motion and requested a muscle relaxer or Biaxin. (Id., pp. 20 – 23.) NP Bailey examined Plaintiff noting slow ambulation with forward flexion and no muscle spasms. (Id.) It was noted that during the exam, Plaintiff stated she could not rotate her head side to side. (Id.) NP Bailey contacted Plaintiff's work supervisor inquiring as to whether Plaintiff was having difficulty ambulating or doing job duties, but the supervisor indicated that Plaintiff did not appear to have any difficulties at work. (Id.) NP Bailey instructed Plaintiff to do range of motion exercises, gentle stretching, warm moist compresses, and band exercise. (Id.)

On April 12, 2018, Plaintiff was again examined by NP Bailey for complaints of chronic pain. (Id., pp. 18 – 19.) Plaintiff requested additional medication for neurological symptoms of sharp shooting pains from her neck radiating to her arms and fingers. (Id.) NP Bailey prescribed Cymbalta and acetaminophen and scheduled Plaintiff for self-directed physical exercises and stretching in Health Services. (Id., p. 17.) On April 30, 2018, Plaintiff reported that Cymbalta was helping with the nerve pain, but she was crying non-stop. (Id., pp. 12 – 15.) Plaintiff requested that Cymbalta changed to Zoloft and a muscle relaxer (Robaxin). (Id.) NP Bailey explained to Plaintiff that Zoloft did not have the same pain reducing properties for neurological pain, but Plaintiff indicated that she wanted the medication changed anyway. (Id.) NP Bailey changed Plaintiff's prescription for Cymbalta to Zoloft and instructed Plaintiff to follow-up with psychology as needed. (Id.) On May 31, 2018, Plaintiff reported to Health Services complaining of neck pain. (Id., pp. 8 – 10.) NP Bailey noted that neurologically, Plaintiff was within normal limits and

ambulated without difficulty. (Id.) NP Bailey noted that Plaintiff's neck and cervical spine complaints were being managed in the chronic care clinic. (Id.) NP Bailey again counseled Plaintiff that she may never be completely pain free and the goal was pain management or reducing her pain. (Id.) Plaintiff was instructed to remain active, to stretch, use warm compresses, and avoid high impact activities. (Id.)

Based upon the foregoing, Plaintiff cannot satisfy the subjective component. The foregoing does not exhibit that Defendants knew of and disregarded Plaintiff's need for medical treatment for her shoulder or neck condition. Thus, the Court finds that Defendants did not act with deliberate indifference. The undisputed medical record reveals that Defendants evaluated Plaintiff and provided treatment following each sick-call request and chronic care visit.[8] Defendants consistently evaluated Plaintiff's condition, reviewed recent MRI results, prescribed pain medications, ordered an EMG study, and directed stretching exercises to occur at Health Services. Concerning Plaintiff's alleged need for pain medication, Defendants consistently provided

---

[8] Plaintiff argues that Declarations from fellow inmates support her claim that Defendants were deliberately indifferent to Plaintiff's medical needs. (Document Nos. 98, 101, and 101-1.) These Declarations, however, contain extraneous evidence and are conclusory. (Document Nos. 101 and 101-1.) The undersigned notes that the Declarations include statements relating to each inmate's personal experience concluding that each inmate has received inadequate medical or mental health care. Thus, the Declarations do not support a finding or conclusion as to Plaintiff's medical care. Next, the Declarations conclude that Defendants were "deliberately indifferent" to Plaintiff's medical needs and she received "inadequate medical care." The Declarations, however, include no statements of facts supporting such conclusory findings. Unsupported affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient to either support or defeat a motion for summary judgment. *Moore v. United States*, 1987 WL 11280 (S.D.W.Va. March 23, 1987); *also see Evans v. Technologies Applications & Service, Co.*, 80 F.3d 954, 692 (4th Cir. 1996)(Summary judgment affidavits cannot be conclusory or based on hearsay). Therefore, courts are not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)(citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001)).

Plaintiff with medications to control her pain and directed the use hot showers or towels to relieve pain. Thus, the medical records reveal that Defendants made sufficient efforts to treat Plaintiff's chronic pain. Plaintiff appears to simply disagree with the appropriate course of treatment. Specifically, Plaintiff is insistent that muscle relaxers and narcotic pain medication was necessary to adequately control her pain. An inmate's disagreement with her medical care or the course of treatment generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation."). Furthermore, Plaintiff's medical records reveal that the use of narcotic pain medication and muscle relaxers was considered and rejected by Defendants on several occasions. Despite Plaintiff's argument that she was properly treated with narcotic pain medication and muscle relaxers by her "outside" doctors prior to her incarceration, such does not state a constitutional violation.[9] See Lewis v. Proctor, 2010 WL 148383, * 3 (N.D.W.Va. Jan. 12, 2010)(an inmate's belief that one doctor's treatment plan was better than another's does not state

---

[9] Plaintiff further argues that she has had carpal tunnel release surgery since her release from prison. (Document No. 98, p. 1.) The foregoing, however, does not establish deliberate indifference. Defendants ordered an EMG to evaluate Plaintiff's condition and the EMG revealed normal results. Specifically, the EMG study revealed "no evidence for right cervical radioulopathy, right median mononeuropathy (carpal tunnel syndrome), or right ulnar neuropathy." (Document No. 95-2, pp. 184-86.) Therefore, the record clearly shows that Defendants did not know of, and disregard, Plaintiff's need for carpal tunnel release surgery.

42

a constitutional violation); <u>Oglesby v. Abbassi</u>, 2013 WL 4759249, * 7, n. 12 (E.D.Va. Sep. 4, 2013)("certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor"). At most, Defendants may have been negligent in prescribing appropriate medication for Plaintiff's pain. It is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." <u>Webb v. Hamidullah</u>, 281 Fed.Appx. 159, 166 (4th Cir. 2008); <u>also see</u> <u>Sosebee v. Murphy</u>, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Accordingly, the undersigned finds that Defendants did not act with deliberate indifference in providing medical treatment for Plaintiff's condition.

**4.    Plaintiff's claim against supervisory officials.**

Plaintiff names the following supervisory officials as Defendants: (1) David Wilson, Former Warden of FPC Alderson; (2) Jennifer Saad, Acting Warden of FPC Alderson; (3) Maria Arviza, Former Associate Warden of FPC Alderson; (4) Angela Dunbar, Regional Director of the FBOP; (5) M. Evans, Corrections Manager Coordinator at FPC Alderson; (6) S. Carver, Associate Warden of FPC Alderson (7) March Inch, Director of the FBOP; (8) Matthew Mullday, Assistant Regional Director; (9) T. Wickline, Business Administrator of FPC Alderson; and (10) Diana Hawk-Sawyer, Administrator of Regional FBOP. (Document Nos. 12-1 and 12-2.) Specifically, Plaintiff alleges that Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer violated her Eighth Amendment rights by "witnessing" medical defendants' "illegal actions [and] failing to correct their misconduct." (<u>Id.</u>)

In Defendants' Motion, Defendants contend that Plaintiff's claim against Defendants

43

Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer are improperly raised based upon supervisory liability. (Document No. 96, pp. 25 – 26.) Specifically, Defendants argue that "Plaintiff has not established the requisite personal or supervisory involvement necessary to support Eighth Amendment <u>Bivens</u> liability for these defendants, and they are entitled to be dismissed from this action." (<u>Id.</u>) In Response, Plaintiff argues that the foregoing Defendants should be held liable because of their "deliberate indifference by failing to act on information indicating that unconstitutional acts were continuing." (Document No. 98, p. 3.) Plaintiff further states that Defendants failed "to remedy a wrong after being informed about it" and created "a policy or custom under which constitutional practices occurred." (<u>Id.</u>)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. at 1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); <u>Also see</u> <u>Monell v. Department of Social Services of the City of NY</u>, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." <u>Fisher v. Washington Metro. Area Transit Auth.</u>, 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." <u>Slakan v. Porter</u>, 737 F.2d 368, 373 (4th Cir.

1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." <u>Moore v. Winebrenner</u>, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer argue that Plaintiff has failed to demonstrate specifically how they were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer violated her constitutional rights with respect to their failure to supervise employees or in responding to her administrative remedies. The dismissal of a defendant is appropriate where the defendant's sole involvement in an action is related to the administrative remedy process. <u>See</u> <u>Fellove v. Heady</u>, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state <i>Bivens</i> claim"); <u>Mabry v. Ramirez</u>, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a <i>Bivens</i> claim for deliberate indifference to serious medical needs"); <u>Paige v. Kupec</u>, 2003 WL 23274357 *1 (D.Md. March 31, 2003), <u>aff'd</u>, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). Besides responding to administrative remedies, the evidence of record does not indicate any personal involvement by Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer. In order to succeed on a medical claim against non-medical personnel, plaintiff must

45

establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4th Cir. 1990). In the instant case, there is no evidence that Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct.[10] Accordingly, Plaintiff has improperly raised her claim against Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The Court therefore finds that Defendants Wilson, Saad, Arviza, Dunbar, Evans, Carver, Inch, Mullday, Wickline, and Hawk-Sawyer's "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" should be granted.

6.    **No Constitutional Right to a Furlough.**

In her Amended Complaint, Plaintiff alleges that Defendants Evans, Harvey, Wilson, Arviza, and Wickline violated her Eighth Amendment rights by denying her request for a social furlough with her five children. In their Motion, Defendants argue that the above claim must be dismissed. (Document No. 96, pp. 26 – 27.) Defendants stated that "even if Plaintiff had exhausted any allegation related to a furlough, she would have no recourse in this Court" because "[i]t is clearly established that the BOP retain completed discretion in granting furlough." (Id.) Plaintiff

---

[10] Additionally, as explained above, there is no indication that medical Defendants acted with deliberate indifference to Plaintiff's medical condition.

failed to address the foregoing in her Response. (Document No. 98.)

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103-04, 60 L.Ed.2d 668 (1979); see also, Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976)("[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty."). Title 18 U.S.C. § 3622, however, authorizes the BOP to grant furloughs. Specifically, 18 U.S.C. § 3622 provides as follows:

> The Bureau of Prisons may release a prisoner from the place of his imprisonment for a limited period if such release appears to be consistent with the purpose for which the sentence was imposed and any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2), if such release otherwise appears to be consistent with the public interest and if there is reasonable cause to believe that a prisoner will honor the trust to be imposed in him, by authorizing him under prescribed conditions, to - -
>
> > (a) visit a designated place for a period not to exceed thirty days, and then return to the same or another facility, for the purpose of - -
> > * * *
> > (5) establishing or reestablishing family or community ties;
> > * * *

18 U.S.C § 3622(a)(5). Additionally, 28 C.F.R. § 570.33 provides that "[t]he Warden or designee may authorize a furlough, for 30 calendar days or less, for an inmate to: . . . (d) Establish or reestablish family and community ties."[11] 28 C.F.R. § 570.33(d). The plain language of 18 U.S.C. § 3622 gives the BOP exclusive authority to determine whether a federal prisoner should be

---

[11]    28 C.F.R. § 570.36(b) provides that "[o]rdinarily, Wardens will not grant furlough to an inmate if: (1) The inmate is convicted of a serious crime against a person; (2) The inmate's presence in the community could attract undue public attention, create unusual concern, or diminish the seriousness of the offense; or (3) The inmate has been granted a furlough in the past 90 days."

granted a furlough.[12] See United States v. Premachandra, 78 F.3d 589 (8th Cir. 1996)(per

curiam)(18 U.S.C. § 3622 vests authority to grant furloughs with the BOP, not the federal courts).

To the extent Plaintiff argues that Defendants were required to grant her temporary release request

because she satisfied all three factors set forth in 18 U.S.C. § 3622, her argument is without merit.

Section 3622 provides that release "may" be granted "if" the first two factors "and" the third factor

are all found to be present. See 18 U.S.C. § 3622. Clearly, Section 3622 does not mandate that the

BOP must release a prisoner that satisfies all three factors. See Woltz v. Carter, 2012 WL 3879950,

* 4 (S.D.W.Va. Sept. 6, 2012)(J. Berger)("Plaintiff simply fails to state a due process claim

because he has no protected liberty interest with respect to the BOP's discretionary determination

of whether he is eligible for a furlough or community confinement."); Clay v. LaManna, 2008 WL

4680579, * 3 (D.S.C. Oct. 21, 2008)(an inmate does not have a liberty interest in a furlough).

Finally, even though the undersigned is sympathetic to Plaintiff's circumstances, the Court lacks

authority to grant Plaintiff's request for temporary release or a furlough.[13] See Premachandra,

supra, 78 F.3d at 589(Section 3622 vests authority to grant furloughs with the BOP); United States

v. Padilla, 2012 WL 2175749, *3 (D.N.M. May 31, 2012)("Congress has expressly provided that

---

[12] The BOP in its discretionary authority established procedures for prisoners to apply for a furlough. *See* 28 C.F.R. § 570.37. Title 28 C.F.R. § 570.37(a) provides that an inmate should submit "a furlough application to staff, who will review it for compliance with these regulations and Bureau policy." 28 C.F.R. § 570.37(a). Subsection (b) further provides that "[a]n inmate will be notified of the Warden's decision on the furlough application" and if the application is denied, "the inmate will be notified of the reasons for the denial." 28 C.F.R. § 570.37(b). Finally, Subsection (c) provides that "[a]n inmate may appeal any aspect of the furlough program through the Administrative Remedy Program." 28 C.F.R. § 570.37(c). In the instant case, it is unclear if Plaintiff submitted a furlough application in compliance with 28 C.F.R. § 570.37. Even assuming Plaintiff did properly submit a furlough application in compliance with Section 570.37, the record is clear that Plaintiff failed appeal the denial of the furlough request through the Administrative Remedy Program prior to filing this action.

[13] The record indicates that Plaintiff has now been released from custody.

48

the BOP has authority to grant furloughs and has not vested such authority with the courts."); United States v. Watson, 2009 WL 1370915 (M.D.Ala. May 14, 2009)("No language in the statute grants district courts the authority to order or approve a furlough request."). The Court, therefore, finds that Defendants "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" should be granted. The undersigned finds it unnecessary to consider the other reasons which the Defendants have submitted for dismissal.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 95) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d

91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Faber and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: April 26, 2019.

Omar J. Aboulhosn
United States Magistrate Judge